BERYL PLANCK, PLAINTIFF IN ERROR, v. STATE OF NEBRASKA, DEFENDANT IN ERROR.

38 N. W. 2d 790

Filed July 14, 1949. No. 32582.

Lafayette D. Hurley, George B. Hastings, and Van Pelt, Marti & O'Gara, for plaintiff in error.

James H. Anderson, Attorney General, and Walter E. Nolte, for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

By amended information filed in the district court for Red Willow County, Beryl Planck and three other persons were charged with unlawfully assaulting Orville Burton with intent to inflict a great bodily injury. This trial involves the prosecution of defendant Beryl Planck. A jury found the defendant guilty as charged. His motion for a new trial having been overruled and a sentence imposed that he serve a term of one year at hard labor in the state penitentiary, the defendant, by petition in error, brings the record of his conviction here for review.

For convenience the plaintiff in error will be referred to as the defendant.

The defendant contends that the evidence is insufficient to warrant his conviction of the crime charged against him.

The record discloses that the defendant, about two months prior to July 27, 1948, purchased a used car business located at McCook, Nebraska, from one Bradley Dolan. On July 27, 1948, the defendant, to celebrate his birthday, invited Seymore Whitt, an employee of his, the defendant's secretary, Bradley Dolan and wife, Donald Cafferty and wife, and Bernard Plourd and wife, the latter two couples living at Indianola, Nebraska, to a party at a night club in McCook.

Earlier in the evening a lady acquaintance of Dolan was registered at the Burton cabin camp located at

McCook. Mabel Burton, wife of Orville Burton the manager of the camp, testified that Dolan and the defendant came to the camp and Dolan registered for the lady. Donald Cafferty testified that he was the man with Dolan at the time and, as a friend, registered for the lady and paid the bill.

The party concluded at about one o'clock the morning of July 28, 1948. The Caffertys, Plourds, and Whitt went to Indianola where they visited with the Caffertys. The defendant was to drive to Indianola later and bring Whitt back to McCook. The defendant, his secretary, Dolan, and his wife, left the party in the defendant's car. They let Mrs. Dolan off at the Dolan residence. Dolan suggested the defendant or his secretary drive him to the Burton cabin camp to pick up the lady who had registered there and put her on a train or bus for Denver, Colorado. They arrived at Burton's cabin camp at about 1:30 in the morning, July 28, 1948. The Burtons were in bed. Mrs. Burton was not asleep, and testified she saw the defendant's car when the party drove into the driveway, and saw them enter cabin No. 5 which was the cabin assigned to the lady when she was registered. In a short time the party created a disturbance by swearing and talking loudly. She called her husband and he got out of bed, dressed, and went to the cabin. His testimony is that he knocked on the door three times before he got a response, and then a man from the inside called him a vile name and asked what he wanted. He requested that they be quiet. The same voice then repeated the vile name and said: "You got your money, didn't you?" and the witness replied that he had, but he would like to have them be quiet. The cabin door was opened and the defendant came out carrying two grips, followed by two women and Dolan. Dolan told Burton to take his glasses off, called him a vile name, and struck him in the face with his fist, knocking his glasses off. Burton fought back. Then the defendant

entered the fray and blows were exchanged between him and Burton.

The defendant testified that when they arrived at the cabin camp they might have made some noise, but there was no loud talking; that Burton rapped on the door and told them they would have to be quiet or get out, and they decided to leave because they did not want trouble. He further testified that he heard Dolan and Burton arguing. He did not see the start of the trouble, but that Burton was beating Dolan up and shoved him against the house. The defendant said: "It looks like he has had enough, Mr. Burton" and Burton said: "Would you like to have a little?" and the defendant said no, but if necessary he could take it. Burton made a swing at him and he hit Burton in the nose, and Burton hit him on the jaw. Burton came back, caught him around the waist and they went to the ground. The defendant pushed and shoved Burton loose and got away and into the car. As they started to drive out the police arrived, and there was some conversation with them. Burton demanded that the defendant and Dolan be arrested. The officers stated that they were local men and when Burton signed the charges, they could be picked up at any time.

The defendant and his party claim they made no threats upon leaving, and Burton heard none. Mrs. Burton testified that they called Burton vile names and said they would be back and get him.

The defendant and his party then drove to Indianola, and upon arriving there went to the Cafferty home. There was some talk about the defendant's and Dolan's experience at the camp. Plourd testified that their anxiety seemed to be that they had been evicted and should have their money back. Cafferty said that he had an interest in the matter because he had registered the lady at the camp and had paid the money. Within a short time Plourd, Whitt, and Cafferty left Indianola in Cafferty's car, and Dolan and the defendant in another car.

The testimony with reference to what occurred upon their arrival at the camp at about 2:45 a. m., is in direct conflict. Mrs. Burton testified that she heard brakes screech and that the defendant, Dolan, and other men drove into the yard. They got out of the car, and the defendant, Dolan, Cafferty, and Whitt went to cabin No. 5. This cabin had been inspected when the occupants left and nothing of theirs had been found in it. They came to the door of Burton's house, banged on it, broke through the screen and yelled a vile name to Burton, daring him to come out and saying that if he did they would kill him. She further testified that more than one of the party was calling to Burton. One of them threw a quart can of paint through a window into a room where Burton's 11-year-old daughter was sleeping. Burton came into the bedroom, and they were still making threats, using vile language and saying they were going to kill him. Burton was in front of this witness, and the screen door leading to the front room was locked and the front door of the office was open. The men were pulling on the screen and yelling in vile language threatening to kill Burton. They pulled the screen off and Burton slammed the door shut, then all of the men plunged through the door and piled into the office. She shoved the defendant out; he was on top of Burton calling him a vile name. They were all making threats and she could not distinguish their voices. Then all of the men and her husband went outside and they were fighting on the outside and they had her husband on the ground. They fought in the front yard for a few minutes and Burton got out from under them and ran east half a block to the Mary Meier cabin camp. He was dressed in a pair of shorts, had on his undershirt and no shoes. The men waited for him to return. She next saw her husband in a neighbor's yard about 20 feet from the Burton residence. There the party engaged in another fight. She, at one time, was struck in the face by the defendant. She detailed the lighting conditions surrounding the

premises, and stated that she could see what was taking place.

Orville Burton testified that when Dolan and the defendant returned at 2:45 a. m., they banged the cabin door defying him to come out, calling him vile names and stating they would kill him. He went to the front door. Four of them were in a huddle, and they continued to threaten him. They jerked the front screen loose from the fastener, and he attempted to brace the door. Someone broke the glass, and they pushed into the room. Cafferty was the first man in, and Burton struck him over the head with a piece of pipe 18 or 20 inches long and 1¼ inches in diameter. Cafferty made the remark that Burton did not hit him hard enough and that he was not afraid. Burton was knocked to the floor and the four men got on top of him and hit him so fast that he did not know where the blows came from. He was pushed around and thrown out into the front yard where the fighting continued. He was knocked to the ground and the men got on top of him again. They were all fighting. He was fortunate enough to break away, and ran down to the Meier cabin camp and tried to arouse Mrs. Meier. He heard a voice in the street say: "Get him with that car." He then ran along the same path toward home. The men were strung out along the path and as he proceeded up the pathway they fought with him. He then turned into Julow's yard and the fighting continued. He was struck by all of them, as far as he knew. He went around the Julow house, and blows were exchanged between him and those after him. He was finally cornered by Whitt who struck him several times with the pipe which Burton had lost in the encounter. He made a break from Whitt and dove through Julow's back door to use the telephone to call the police. He braced the door as best he could, and Whitt proceeded to knock the door to pieces, but did not gain access to the room. All of a sudden the

attack ceased.  He did not hear a gun, but Mrs. Julow said: "Orville, I shot him."

Mrs. Julow, the neighbor, testified that when the defendant and Dolan and party left the cabin camp after the first encounter they threatened to get a gang and come back, and they used vile language to the Burtons. When they returned at about 2:45 a. m. they went into cabin No. 5 which she could see readily from her premises, kicked the furniture to pieces, and threatened Orville Burton to come out.  She saw most of the fighting that took place.  During a part of it she endeavored to rescue the Burton girl who was running in the direction of her father, and was told to keep out of the matter because it was none of her business.  Her glasses were knocked off, and she was assaulted with the gas pipe. We deem it unnecessary to further relate the testimony of this witness except to say that she corroborated the testimony of the Burtons with reference to the fighting; stated that she could see most of what happened; and detailed the fighting as it occurred on her premises.  The fighting ended when she shot Whitt in the leg with a revolver.

Orville Burton testified that he was badly beaten up; his face and head were swollen; and wounds on his lip and head had to be sutured.  He was unable to work for three or four weeks due to the condition of his feet.

Plourd testified for the defendant, that he was in the party that returned from Indianola in the car that Cafferty was driving, and that he was present at the Burton's cabin camp; that upon arriving at the camp Cafferty got out of the car, knocked on the front door of Burton's house and asked if anybody was home, or something of that nature; that Cafferty was struck from within, but he did not know who struck him; and that Dolan and the defendant must have parked their car some distance from there.  He was unable to give much detail because things were happening fast and there was excitement.  Cafferty made a remark that he was floored, and

staggered around a bit and Burton seemed to be angry. From then on the defendant and the other men charged the door and things happened pretty fast. The glass was shattered. They came out in a short time, exchanged blows, struck at each other, and stumbled to the ground. Burton still had the weapon which he presumably struck Cafferty with, and was on top of him. Dolan pulled Burton off of Cafferty and after that Burton got to his feet and ran from the scene of the fight. Whitt helped this witness walk Cafferty over to the car and get him in the car. At that time he saw Burton in Julow's yard and thought it would be a good time to get Cafferty to a doctor, so they left.

The defendant testified that when they left the cabin camp at about 1:30 a. m., they proceeded to Indianola and something was said about getting the money back for the cabin. Finally some of the party decided to go to the camp, and he and Dolan left Indianola for McCook. They drove to the defendant's parking lot where Dolan had left his car. They slowed down and stopped, and Dolan said: "* * * well, maybe we had better go on down to the cabin camp where these boys left for, we started the trouble and Don might get in a lot of trouble, * * *." They went down and parked the car by the Meier cabin camp. At the intersection they heard a commotion, and Dolan got out of the car and ran down to the place. The two girls remained in the car, and the defendant walked to the Burton camp. He saw Cafferty at the door, and afterwards saw Cafferty and Burton roll out on the ground, and they were struggling. Dolan was then a few feet away from them and ahead of the defendant. Dolan walked over and pulled Burton off of Cafferty. He did not hit him, but jerked him off, and Burton got up and ran away. Cafferty got up and started after him, but did not get far until he went down on the ground. Burton went on down the road. Cafferty had blood on his shirt and somebody said they had better get him in the car and get him to a doctor. Whitt and Plourd loaded him

into the car. About that time Dolan and the defendant got into the defendant's car and drove to where the defendant's secretary stayed, and let the girls out. He and Dolan were taken by the police and lodged in jail. He further testified that in the second fight he did not at any time strike Burton or hit anybody at the cabin camp, nor express an intent to do any injury to Burton; that he did kind of slow him down when he hit him in the nose when they were at the camp to pick up Dolan's acquaintance; and that was the only time that he touched Burton. He did not hear any threats made against Burton's life at any time, and he saw nobody hit Burton while he was there, except Cafferty.

Dolan testified that he and the defendant were at the Burton cabin camp at 1:30 for the purpose of picking up his friend to put her on a train or bus to Denver; that after they were there a short time there was a rap on the door; that he made a low remark to the people inside of the cabin that someone was looking for him; and that he did not answer the knock. When he heard the knock the second time he asked what they wanted, and someone in a loud, surly tone said to be quiet or leave. Dolan said they were leaving as quickly as they could. He then told the manner in which they left, and testified that as he walked out Burton said to him: "* * * get going," and he said: "We are leaving," and Burton said something else. Dolan could see that Burton was getting mad, and told him not to get excited. Then, when he turned around, he was hit in the back of the head. He turned around and hit Burton. Burton came at him pretty fast and almost succeeded in knocking him out. He testified that they went to the police station as they were worried about what had occurred, and were informed that if they were wanted they would be picked up.

We conclude the evidence as shown by the record was sufficient to warrant the submission to the jury of the offense charged.

The law is established in this jurisdiction that this

court, in a criminal action, will not interfere with a verdict of guilty, based upon conflicting evidence, unless it is so lacking in probative force that we can say, as a matter of law, that it is insufficient to support a finding of guilt beyond a reasonable doubt. Williams v. State, 115 Neb. 277, 212 N. W. 606; Haines v. State, 135 Neb. 433, 281 N. W. 860; Lee v. State, 124 Neb. 165, 245 N. W. 445.

Where the evidence in a criminal case is conflicting, and from its consideration different minds may reasonably arrive at different conclusions, the weight to be given thereto is a question for the jury. Norton v. State, 119 Neb. 588, 230 N. W. 438; Guerin v. State, 138 Neb. 724, 295 N. W. 274. See, also, Luster v. State, 142 Neb. 253, 5 N. W. 2d 705.

The defendant predicates prejudicial error on the part of the trial court in submitting certain instructions to the jury, especially instructions Nos. 10 and 13.

The court, in instruction No. 7, properly defined the crime charged, and in instruction No. 8, under the authorities of this state, properly defined intent, which is a material element of the offense charged. In instruction No. 9, the court set forth the material elements of the principal offense in the amended information which the State was obligated to prove beyond a reasonable doubt in order to convict the defendant, and specifically named those alleged to have assisted or participated with him in the assault to inflict great bodily injury.

We set forth instruction No. 10, upon which the defendant predicates prejudicial error: "The law further provides, 'Whoever aids, abets or procures another to commit any offense, may be prosecuted and punished as if he were the principal offender.' To 'aid' means to assist; to help in the commission of an act. To 'abet' means to incite, encourage or instigate another to commit an offense. 'Procure' means to contrive; to bring about; to cause. You are further instructed that all persons who act together with a common intent and design

in the commission of a crime, such as charged in the amended information in this case, and all persons who aid, abet or procure another to commit any offense, are equally guilty as principals in the commission of any offense while the parties are so acting. It is not essential to a conviction of the defendant on trial in this case that the State establish that Beryl Planck alone committed the offense charged in the amended information. If you believe from the evidence, beyond a reasonable doubt, that the acts complained of in the amended information were committed by the defendant on trial, conspiring or acting in conjunction with some other person or persons, with a common purpose and design, one doing one thing and one doing another thing in connection therewith; or that the defendant on trial, being personally present, possessing the intent to inflict a great bodily injury as hereinbefore explained in these instructions, in any manner knowingly and intentionally aided, abetted or encouraged some other person or persons in the commission of the offense charged; then, if you so find, the defendant on trial would be equally guilty in the commission of any offense committed while the parties were so acting."

The defendant argues that this instruction withdrew from the jury the question of felonious intent which is required by law to be proved before the defendant could be convicted of the principal offense charged; that the trial court attempted to cover the whole case in this instruction; further, that the question of the commission of the crime by the principals, designated as "other person or persons" is assumed and that question is not submitted to the jury for its consideration as a question of fact to be resolved by them.

It will be noted that the court used the following language in the instruction: "as hereinbefore explained in these instructions." It is apparent the court did not attempt by this instruction to cover the whole case as claimed by the defendant, but only the phase of the case

relating to aiders, abettors and procurers' responsibility as principal. It was necessary for the trial judge to instruct the jury as to the liability of the defendant Beryl Planck by reason of participating in concert with the other men named in the information and as to the guilt under section 28-201, R. S. 1943, as an aider or procurer.

In view of all of the instructions in this case, we conclude the trial court did not, by this one instruction, attempt to or cover the whole case insofar as the principal offense charged is concerned.

The defendant argues that instruction No. 13, which relates to self-defense, contains a limitation in the use of language in substance as follows: If the defendant, or one or more of his companions while acting in conjunction with the defendant, and with a common purpose and design, assaulted the complaining witness at a time when they had no reasonable apprehension of immediate or impending danger to himself or his companions; that the word "they" should have read "he" and cast a burden upon the defendant which under the peculiar facts and circumstances of this case was unduly prejudicial to him; that the question was not as submitted by the court whether Cafferty, Dolan, or Whitt had no reasonable apprehension of immediate or impending danger or had such reasonable apprehension, but whether the defendant Planck, who was alone on trial, had no reasonable apprehension of immediate or impending danger.

The defendant relies on the case of State v. Hartzell, 58 Iowa 520, 12 N. W. 557, which contains an instruction similar to the one given in this case, and wherein it was held the instruction constituted prejudicial error.

The rule in Iowa is that where instructions are conflicting and inconsistent with each other they are necessarily prejudicial. Hoeft v. State, 221 Iowa 694, 266 N. W. 571, 104 A. L. R. 1008. Under such rule the instruction was held to be prejudicial. It would not necessarily

be prejudicial in this state. This court, under section 29-2308, R. S. 1943, has the privilege within its discretion to examine instructions which appear to be conflicting or confusing, and to determine whether, under the instructions considered as a whole, there is any such error in instructions singled out that would result in a miscarriage of justice.

From an analysis of instruction No. 13, we conclude it instructed the jury under the right of self-defense for an individual or for a group of individuals. It specifically states "no reasonable apprehension of immediate or impending danger to himself or his companions," and in view of the whole charge to the jury, the instruction is not prejudicially erroneous.

Further, in this state the applicable law applying to such situation is as follows: "Where the charge to the jury, considered as a whole, correctly states the law, the verdict will not be reversed merely because a single instruction, when considered separately, is incomplete." Sedlacek v. State, 147 Neb. 834, 25 N. W. 2d 533, 169 A. L. R. 868; Nanfito v. State, 136 Neb. 658, 287 N. W. 58; Norton v. State, *supra.*

"The rule is well established that it is the duty of the court to instruct the jury on the law of the case, whether requested so to do or not; and an instruction or instructions which, by the omission of certain elements, have the effect of withdrawing from the consideration of the jury an essential issue or element of the case, is erroneous; but where the jury is instructed generally upon the law, and when the instructions given do not have the effect above stated, then error cannot be predicated upon the failure of the court to charge upon some particular phase of the case unless a proper instruction was requested by the party complaining." Jones v. State, 147 Neb. 219, 22 N. W. 2d 710; Sedlacek v. State, *supra;* Lee v. State, *supra.*

From an analysis of the entire charge to the jury in the instant case, we conclude that the instructions com-

plained of did not constitute prejudicial error.

The defendant contends that the trial court committed prejudicial error in interrogating the witness Plourd, witness for the defendant, in that the court argued with the witness and stated in the presence of the jury that the defendant and the witness went to the cabin camp of the complaining witness Burton knowing that an act of violence would be committed, and the court thereby indicated to the jury his belief in the guilt of the defendant, and by reason thereof the defendant was denied a fair trial.

The following questions are involved in this assignment of error. "1327 THE COURT: What was your business in going up to McCook from Indianola? A- Well, it was really none of my affair, your honor, as I said a few moments ago I thought it would be a good idea, knowing the police had already been at the scene of the first altercation that it might be a good idea to go along to see that the $3.00 was peaceably asked for— I just like to see people get along. 1328 THE COURT: Then you expected violence to be used when you got to the Burton Cabin Camp, you anticipated violence? A- As I answered you, I didn't anticipate violence— excitement is bad for me and I don't like fights." Defendant's counsel moved for a mistrial, which was overruled.

Defendant argued that the statement made by the court was not couched as a question; that it solicited no answer but conveyed to the jury the idea that because of the conversation held among the four men at Indianola, the witness expected violence to be used when the parties returned to the cabin camp; and was particularly prejudicial because it instantly set up in the minds of the jury the thought that the plan for the making of this felonious assault was made in the meeting of the men following the birthday party. Defendant cites from Moore v. State, 147 Neb. 390, 23 N. W. 2d 552, as follows: "The trial judge during the course of a trial should refrain from

remarks that are calculated in any way to influence the minds of the jury." The opinion cites 26 R. C. L., Trial, § 27, p. 1026: "The judge should, during the course of the trial, refrain from remarks that are calculated in any way to influence the minds of the jury. This includes remarks to counsel touching the management of the case and reflecting on their conduct, as well as those touching the character of the witnesses and the value of their testimony; and, if the remarks so made are material and improper, they may be prejudicial. Accordingly, if properly excepted to and brought into the record, they may work a reversal of the case on that ground." To like effect is 23 C. J. S., Criminal Law, § 993, p. 349, which was approved in Hansen v. State, 141 Neb. 278, 3 N. W. 2d 441.

As stated in Kraus v. State, 102 Neb. 690, 169 N. W. 3: "It is well known to those who are familiar with jury trials that jurors are usually alert to discover the attitude of the court respecting the merits of the case, and particularly in criminal actions."

The authorities cited by the defendant in support of the foregoing contention clearly manifest that the trial court took a prominent part in the trial, and on numerous occasions interjected his personal views and opinion as to the guilt or innocence of the accused, which is not true in the instant case. The trial court's duty in such respect is well exemplified in 23 C. J. S., Criminal Law, § 991, p. 345: "For the purpose of eliciting evidence which has not otherwise been brought out, or to clarify testimony, it is ordinarily proper for the judge to put competent and material questions to a witness either on his examination in chief or on his cross-examination, and where anything material has been omitted, it is sometimes his duty to examine a witness. * * * However, such examination must be conducted without prejudice to accused, and in such a manner as to impress the jury with the idea that the judge is entirely impartial; * * *."

We are not in accord with defendant's contention that

the trial court argued with the witness and elicited his statement. The bill of exceptions shows that he asked the witness a question, the witness answered it, and the matter was pursued no further. We do not believe the court's question in such respect was one of bias or prejudice, or indicated the court's opinion regarding the guilt or innocence of the accused, and the defendant's contention in such respect cannot be sustained.

For the reasons herein given, the judgment of the trial court is affirmed.

AFFIRMED.