FRED CLEMENTS V. STATE OF NEBRASKA.

FILED DECEMBER 18, 1907.   NO. 15,208.

1. **Criminal Law: REBUTTAL EVIDENCE: WITNESSES: INDORSEMENT ON INFORMATION.** Where it becomes necessary to call persons to testify in rebuttal of testimony introduced on behalf of an accused in his defense, and the evidence sought to be introduced is obviously and purely rebuttal in its nature, it may be given by witnesses whose names are not indorsed on the information.

2. **Homicide: EVIDENCE.** Where a witness for a defendant on trial for the crime of murder exhibits a hat to the jury, and by his evidence conveys the impression that certain holes therein made were made by a shot or shots fired at the defendant and his family by the deceased, it is competent for the state to rebut this impression by proving that the holes in the hat are not shot holes, although the hat itself has not been formally offered in evidence.

3. **Criminal Law: INSTRUCTIONS.** It is not error for the court to refuse to give an instruction requested by the defendant which does not contain a full and correct statement of the law applicable to the facts of the case as shown by the evidence.

4. ———: ———. The introduction of evidence tending to impeach a witness does not require the court to instruct the jury to totally disregard his evidence, and it is proper to refuse such instruction.

5. ———: ———. It is not error for the court to refuse to instruct the jury that they should carefully scrutinize evidence of the prosecuting attorney because of the natural and unavoidable tendency of persons in his position to hear and remember only such matters as are favorable to the state.

6. ———: ———. An instruction that "a doubt produced by an undue sensibility in the mind of any juror in view of the consequences of his verdict is not a reasonable doubt; and the juror is not allowed to create sources or materials of doubt by resorting to trivial or fanciful suppositions and remote conjectures as to a possible state of facts differing from those established by the evidence. You are not at liberty to disbelieve as jurors, if, from all the evidence, you believe as men. Your oath imposes on you no obligation to doubt where no doubt would exist if no oath had been administered"—is not to be commended in all cases, but we cannot reverse a judgment of conviction solely for the giving of this instruction.

7. ———: ———. Error ·cannot be predicated upon a single clause or expression contained in an instruction, if the whole instruction, when read and considered together, correctly states the law applicable to the case.

8. ———: New Trial. Newly discovered evidence which is doubtful in its character, and is merely cumulative, is not a sufficient ground for a new trial.

Error to the district court for Sarpy county: George A. Day, Judge. *Affirmed.*

*B. S. Baker, James T. Begley* and *F. G. Hamer,* for plaintiff in error.

*W. T. Thompson, Attorney General,* and *Grant G. Martin, contra.*

Barnes, J.

Fred Clements, who was the defendant in the district court, was charged with the killing of one Luke Goldie. He was convicted of the crime of murder in the second degree, and brings the case here for review.

We learn from the record that at the time of the killing, the defendant resided on the east side of Chicago street, which is an extension of Twenty-Seventh street of South

Omaha. The deceased resided on the west side of said street, about 50 feet south of the Clements residence, his lot being the second one south of the intersecting street, which is known as Grace street. Chicago street runs north and south. Grace street runs east and west. On the evening of the 3d day of August, 1906, the deceased returned to his home from South Omaha with a one-horse wagon loaded with bricks. If we are correct in our understanding of the evidence, the homes of the deceased and the defendant are located on a hill, or on the side of a hill. In driving up this hill with his load of bricks, the deceased stopped his horse to rest in front of the barn gate of the defendant. He then drove on to his own home. One Frank Gurness was assisting him, and on his arrival in his own yard the deceased heard his dog howling over at the defendant's place, and said to Gurness: "You un-hitch the horse, and I will go and see about my dog." He then walked across the road to the defendant's fence. Several persons, among whom were two women, accompanied him. He found one of the Clements boys abusing his dog, and asked what he was doing. The defendant was near by with a gun in his hand, and his sons were also present. As soon as the deceased made the inquiry above quoted, the defendant gave the order to shoot, and immediately the firing began. The deceased, together with those who had accompanied him, rushed back toward his house, and, while running, he was struck in the leg by one of the bullets. About the time he arrived at the northeast corner of his home Gurness came from the horse and wagon, and assisted him into the house. He was also followed and assisted by his wife. Gurness took him through the kitchen into the front room, and about this time one Frank Gendra came from the Sofal house, which is located immediately south of the home of the deceased, entered the west door and passed through the kitchen into the front room. There he found Goldie and Gurness. The deceased showed him the wound in his leg; and, while Gendra was standing near the east window, the firing began a second time.

Several shots were fired, some of which passed through the window, breaking the glass and knocking it into Gendra's face. One of the shots struck the deceased in the side. He fell to the floor, and died the same night from the effect of this wound. The bullet which caused his death, and which was taken from his body, was shown to be from a 38-caliber rifle. The defendant was seen in the yard with his gun at or near the time the deceased received the fatal wound. The defense which seems to be most relied upon was an alibi.

The defendant's first contention is that the court erred in allowing one John McBride to testify against him, because the name of said McBride was not indorsed on the information. It appears that after the state had produced its evidence in chief and rested, the defendant, and other members of his family, testified in substance, that he and his son Henry had gotten into a buggy prior to the shooting, and driven out of the wagon gate, thence north about 450 feet to the county line road, thence west about 600 feet, thence south on Duncan street about 450 feet, thence east on Grace street to the wagon gate, from whence they started; that after they had reached a point about half way round the square above described, and while near the intersection of the county road and Duncan street, the shooting commenced at the Goldie and Clements residences and continued for some time, but was all over before they returned to the vicinity of the Goldie residence. It was also claimed that the first shots fired were from the Goldie residence toward the Clements house, and were thereafter interchanged from each of the two residences. To rebut this evidence the state called several witnesses, among whom was John McBride, and after the usual preliminary questions the prosecuting attorney asked him the following question: "Did you see the defendant, Fred Clements, during the shooting which occurred near the Goldie premises on the evening of August 3d last?" No objection was interposed to this question, and the witness answered: "Yes, sir." Then followed the question:

"Where was he?" This was objected to by the defendant, and was not answered. The prosecutor then asked the witness: "Did you see all of the shooting that occurred there on the evening of August 3d?" This was objected to by the defendant as being "incompetent, irrelevant and immaterial, and not proper rebuttal; the witness' name not being indorsed on the information, and leading and suggestive and not calling for the fact." The objection was sustained. The prosecutor then asked the following: "Mr. McBride, at any time during the shooting in the vicinity of the Goldie and Clements premises on the night of August 3d last, was the defendant, Fred Clements, on the county line road, or on the road running north and south in the vicinity of Shellhardt's, or at any time during that shooting was he on the road leading north and south between Shellhardt's and Bradford's, or between Bradford's and the clump of trees testified to, immediately east of Bradford's?" This was objected to as being incompetent, irrelevant and immaterial, and not proper rebuttal, and for the further reason that the witness' name was not on the information, and was leading, suggestive, and not calling for the fact. The objection was overruled, and the witness answered: "He was not." He was next asked: "At any time during the shooting in the vicinity of the Goldie and Clements premises, on the night of August 3d last, was the defendant, Fred Clements, in a buggy, upon any portion of the road we have described to you in the previous question?" To this question the same objection was interposed, which was overruled, and the witness answered, "No, sir."

In *Kelly v. State*, 51 Neb. 572, it was said: "Where it becomes necessary to call persons to testify in rebuttal of testimony introduced on behalf of an accused in his defense, or if it is rendered necessary by a material issue raised for the first time in the case by the evidence for the defense, and the evidence sought to be introduced on rebuttal is obviously and purely rebuttal in its nature, it may be given by witnesses whose names were not indorsed

on the information"—citing *Goldsby v. United States,* 160
U. S. 70, 16 Sup. Ct. Rep. 216; *State v. Parish,* 22 Ia.
284; *State v. Ruthven,* 58 Ia. 121; *State v. Huckins,* 23 Neb.
309, and *Fager v. State,* 49 Neb. 439. The record discloses
that the defendant introduced evidence tending to estab-
lish an alibi. By such evidence he located himself in a
buggy, driving over the road described by the question of
the prosecutor, during the time the shooting in question
was going on. That it was the province and the duty of the
prosecuting attorney, if he could do so, to show on rebuttal
that the defendant was not in the 'place mentioned and
described in his evidence, there can be no doubt, and that
this was the purpose in calling McBride as a witness. It
appears that the court carefully excluded the evidence
offered as to the whereabouts of the defendant, and con-
fined the testimony of the witness to the declaration that
the defendant was not on the road, or in the buggy, the
place described by himself and his witnesses, at the time
of the shooting in question. That this was purely and
strictly rebuttal evidence there can be no doubt. If it
be said that the competency of the witness to testify to the
fact stated by him was doubtful because of his lack of
knowledge, or, in other words, because a sufficient founda-
tion had not been laid, the answer must be that it was not
objected to for that reason. The defendant did not seek
to question the competency of the evidence, or the founda-
tion for its introduction, but relied upon the fact alone
that the name of the witness was not indorsed on the in-
formation. So we are of opinion that the reception of this
evidence was not reversible error.

Defendant's next assignment is that the court erred in
permitting the prosecuting attorney to examine the wit-
ness John Briggs concerning a certain hat and its condi-
tion, over defendant's objections. It appears that one Carl
Clements, a son of the defendant, while on the witness
stand, was shown a hat by the defendant's counsel, and
was asked if he wore that hat at the time of the shooting
in question. He answered that he did. His attention was

then called to certain holes in it and its condition and he testified that the holes were shot into the hat at the time said shooting took place. He thus conveyed the impression to the jury that Goldie, or some one at his place, had shot at the defendant and his family. It was therefore proper to rebut Carl's evidence by showing that the holes in the hat were not shot holes, and this was what was done by the evidence of the witness Briggs.

The defendant further alleges that the trial court erred in refusing to give the jury the following instruction: "If you find that the Clementses were on or in the public road in front of their premises, and, without blame on their part, were fired upon by Luke Goldie, the Clementses or any one of them were justified in firing upon said Goldie even though they knew the result of their shooting would be to kill said Goldie." This instruction is not a correct statement of the law, and is not applicable to the facts of this case. The undisputed evidence shows that the deceased received his fatal wound after he had sought what he supposed was a place of safety, and while in his own house. So, even if the evidence showed that he or some partisan of his fired upon the Clementses, the defendant would not be justified in following the deceased to his own premises and shooting him after he had taken refuge under his own roof. Again, we find no convincing evidence in the record which shows that any shot or shots were fired at the defendant or his sons from the Goldie premises, or that any member of the Goldie party had a firearm of any kind in his or her possession.

It is also contended that the court erred in refusing to give instructions Nos. 4 and 5 requested by the defendant. These requests were on the point above mentioned, and in line with the instruction last above quoted. So this contention requires no further consideration.

Defendant alleges that the court erred in refusing to direct the jury to entirely disregard the testimony of Frank Gurness; and that the court erred in refusing to instruct the jury to totally disregard the testimony of a

witness that had knowingly sworn falsely. An examination of the record discloses that the court, on his own motion, gave an instruction which embodied the principle contained in the foregoing requests, but made it general in its nature, so as not to direct the attention of the jury to any particular part of the evidence, or the testimony of any particular witness. The instruction given was proper, and obviated the necessity for the special requests above mentioned.

Defendant further insists that the court erred in refusing to instruct the jury as follows: "You are instructed that the prosecuting attorney, whose duty it is to prosecute, in case he testifies as a witness, it would be your duty to scrutinize his testimony with more care and caution than an ordinary witness, because of the natural and unavoidable tendency of persons in like position to hear and remember only such matters as are favorable to the state." It appears that the only testimony given by the prosecuting attorney was directed to the identification of certain photographs of the Goldie and Clements premises. Hence the instruction tendered could serve no useful purpose. It may be further said that the prosecuting attorney is not in that class of persons to whom such an instruction is applicable.

In a separate brief filed by one of the defendant's counsel the twenty-second paragraph of the instructions given by the court, on his own motion, is vigorously assailed. This is a copy of the instruction defining a reasonable doubt, given and approved in *Willis v. State*, 43 Neb. 102; *Barney v. State*, 49 Neb. 515; *Davis v. State*, 51 Neb. 301; *Carrall v. State*, 53 Neb. 431; *Bartley v. State*, 53 Neb. 310; *Leisenberg v. State*, 60 Neb. 628; *Savary v. State*, 62 Neb. 166; *Nightingale v. State*, 62 Neb. 371, and *Schwartz v. State*, 65 Neb. 196. It is true, however, that this instruction was criticised by Judge HOLCOMB in *Bothwell v. State*, 71 Neb. 747, and by Judge SEDGWICK in *Lillie v. State*, 72 Neb. 228, and was also criticised by the writer of this opinion in a more recent case; but we have consistently held

that we will not reverse a conviction for the giving of this instruction alone, and we see no reason to depart from that rule in this case. Counsel also select expressions from two other instructions, and contend that they have the effect of shifting the burden of proof to the defendant. We have examined these assignments, and find that the instructions from which these expressions are selected, when taken as a whole, correctly state the law, and they are not subject to counsels' criticism.

Finally, it is contended that the court erred in refusing to grant the defendant a new trial on the ground of newly discovered evidence. It was alleged by the defendant, and shown by affidavit, that after the conclusion of the trial he for the first time discovered that Charles Norris, his daughter Marie and one Seater would testify to matters in support of his alibi. We have carefully examined the record, and find that none of the witnesses mentioned were able to testify conclusively or positively to the fact that the defendant was in the buggy, upon Twenty-Seventh street, the county line road, Duncan street, or Grace street, at the time of the shooting at the Goldie premises. Not one of these witnesses was able to say that he recognized the defendant as one of the occupants of the buggy. It is true that it is alleged that one or two of these witnesses would testify that they thought, at the time, the defendant was one of the occupants of the vehicle, but it appears that their only reason for such thought was the fact that they thought they recognized the rig as one belonging to the defendant. Again, it will be observed that this evidence possessed very little, if any, probative force, and, at most, it could only be said to be cumulative. Such evidence has never been held sufficient to furnish ground for a new trial.

In conclusion it may be said the record in this case presents such a state of facts that it is difficult to see how the jury could have arrived at any other verdict than the one returned by them. We are convinced that the defend-

24

ant had a fair and impartial trial; in fact, he practically had his own way in presenting his theory of the defense. The record contains no reversible error, and therefore the judgment of the district court ought to be, and is,

AFFIRMED.